678 A.2d 342

COMMONWEALTH of Pennsylvania, Appellee,

v.

Seifullah ABDUL–SALAAM, Appellant.

Supreme Court of Pennsylvania.

Argued Dec. 7, 1995.

Decided June 18, 1996.

518

520

Spero T. Lappas, Harrisburg, for S. Abdul–Salaam.

J. Michael Eakin, Alison Taylor, Carlisle, Robert A. Graci, Office of Attorney Gen., Harrisburg, for Com.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY and CASTILLE, JJ.

## *OPINION*

CAPPY, Justice.

This is a direct appeal of the judgment of sentence of death imposed by the Court of Common Pleas of Cumberland County Pennsylvania.[1] Following a jury trial, Appellant, Seifullah Abdul–Salaam, was found guilty of murder of the first degree, robbery, and conspiracy. He was sentenced to death for the first degree murder conviction.[2] The jury found that the aggravating circumstances of: 1) the victim was a peace officer who was killed in the performance of his duties;[3] 2) Appellant committed a killing while in the perpetration of a

1. 42 Pa.C.S. § 722(4); 42 Pa.C.S. § 9711(h).

2. Additionally, Appellant received a concurrent sentence of four to eighteen years imprisonment for the single count of robbery and one and one half to five years imprisonment and prosecution costs for the single count of conspiracy.

3. 42 Pa.C.S. § 9711(d)(1).

felony (robbery);[4] 3) in the commission of the offense, Appellant knowingly created a grave risk of death to another person in addition to the victim of the offense;[5] and 4) Appellant has a significant history of felony convictions involving the use or threat of violence to the person,[6] outweighed the mitigating circumstance concerning the character and record of the Appellant and the circumstances of his offense.[7]

### *Sufficiency Of The Evidence*

 Although Appellant does not challenge the sufficiency of the evidence, as in all cases in which the death penalty is imposed, we must conduct an independent examination of the sufficiency of the evidence supporting the Appellant's conviction. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). "In reviewing the sufficiency of the evidence, we must determine whether the evidence, and all reasonable inferences deducible therefrom, viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to establish all the elements of the offense(s) beyond a reasonable doubt." *Commonwealth v. Hughes,* 536 Pa. 355, 361, 639 A.2d 763, 766 (1994). With these standards in mind, we will review the record in this matter.

 The record reveals that on the morning of August 19, 1994, Appellant and Scott Anderson drove toward the town of New Cumberland, Pennsylvania in a borrowed Suzuki Sidekick. First, in Camp Hill, Pennsylvania, then outside of New Cumberland, the two men asked for directions. At approximately 10:30 a.m., Appellant and Anderson arrived in New Cumberland and parked their car in Maple Alley. Maple

4. 42 Pa.C.S. § 9711(d)(6).

5. 42 Pa.C.S. § 9711(d)(7).

6. 42 Pa.C.S. § 9711(d)(9).

7. 42 Pa.C.S. § 9711(e)(8). Specifically, the jury found that: "[a] background that includes both physical and mental abuse does have a negative impact on a person's development and therefore his future behavior."

Alley runs perpendicular to Fourth Street. Appellant walked across Fourth Street to the D & S Coin Shop which was owned by Mr. Dale Rishel. The coin shop was a one-room building with storefront windows. Appellant knocked on the door to the coin shop and entered. A resident of Fourth Street, Mr. Vinh Tran, observed Appellant pass him on the street and noted that Appellant knocked on the coin shop door, since few people knocked before entering. Anderson followed and entered the coin shop shortly thereafter, carrying gloves and a bag. Again, Mr. Tran observed Anderson and found remarkable Anderson's heavy clothing on such a warm summer's morning.

Once inside the coin shop, Appellant asked Mr. Rishel about specific gold coins. Mr. Rishel responded that he did not carry that inventory but suggested another dealer. Appellant then pulled a revolver from under his shirt and he and Anderson came across the counter onto Mr. Rishel to subdue him. The front window of the store was broken during this altercation. Mr. Rishel was taped across the face and around his legs, and his hands were tied behind his back with a cord. Appellant kicked Mr. Rishel in the head, while Anderson began to go through Mr. Rishel's goods.

Immediately upon hearing the breaking of the front window of the coin shop, Mr. Tran alerted his landlord, Mr. James Howie, of the situation. Mr. Howie called 911. Officer Willis Cole of the New Cumberland Police Department ultimately responded to the 911 call. Officer Cole parked his squad car on Fourth Street in front of Mr. David Michael's barbershop, which is on the same side of Fourth Street as the coin shop. As Officer Cole approached the coin shop, the perpetrators apparently became aware of his presence and, finding no rear escape, exited the front door, first Appellant, then Anderson.

Appellant was able to escape from the scene, however, Officer Cole intercepted Anderson. Officer Cole ordered Anderson to lie face down and prepared to handcuff him. Mr. Michaels watched as Appellant, with his back against a building and revolver drawn, reappeared from Maple Alley as if he had circled part of the block. Appellant then sprinted from

the alley toward Officer Cole shooting at Officer Cole as he ran. Having been warned by individuals in the street, Officer Cole was able to return Appellant's fire, hitting Appellant in the leg. However, Appellant continued shooting. Officer Cole staggered into the middle of Fourth Street and collapsed after receiving a bullet through his heart. These events, literally unfolding in front of them, were observed by various witnesses who lived and/or worked in the neighborhood, including Mr. Rishel, Mr. Tran, Mr. Howie, and Mr. Michaels.

Appellant and Anderson fled the scene, dropping the revolver used to kill Officer Cole as they ran. They returned to their car and proceeded in the direction of Harrisburg.

After receiving a description of the Suzuki and of Appellant and Anderson via police radio, Officer Rodney Smith of the Middlesex Township Police Department spotted and pursued the two individuals outside of Harrisburg. After a high speed chase, Appellant and Anderson lost control of the Suzuki which then came to a stop. The men abandoned the car, fleeing on foot. As Appellant exited the vehicle, he looked directly at Officer Smith. Anderson was found several blocks away and was arrested. Shortly thereafter, Appellant was arrested in an alley near the home of his girlfriend, Christina Reeves, while the two were walking her dog.

Ms. Reeves agreed to allow the police to search her home, where Appellant occasionally spent the night. She also signed a consent form indicating that the police were searching for a handgun and clothing. Pursuant to the search, the police found a briefcase in Ms. Reeves' bedroom closet which contained ammunition and correspondence belonging to Appellant.

After his arrest, Appellant invoked his right to counsel and his right to remain silent. Appellant requested treatment for his leg wound and was taken to a local hospital accompanied by a custodial officer, Detective Victor Rivera. Appellant and the officer engaged in small talk when Appellant asked the officer, "What are my options?" The officer readvised Appellant of his rights and told him that he could tell his attorney

whatever it was that he wanted to tell him. Appellant then stated: "All I'm going to say is that 'Scotty Love' did it." No follow-up questions were asked by Detective Rivera.

At trial, various witnesses, including Mr. Rishel, Mr. Tran, Mr. Howie, Mr. Michaels, and Officer Smith, testified as to the events surrounding the robbery and the murder of Officer Cole. Among those witnesses, a ballistics expert was able to match the revolver left at the scene with the bullet recovered from Officer Cole's body and a Pennsylvania State Police Officer employed in the Latent Print and Automated Fingerprint Identification sections of the Laboratory Division was able to match Appellant's fingerprint with a latent fingerprint found in the Suzuki.

The above facts are more than sufficient to satisfy us that the Commonwealth presented sufficient evidence to sustain Appellant's conviction for first degree murder, robbery, and conspiracy. Having considered the sufficiency of the evidence, we turn next to Appellant's particular claims of error.

### Suppression Issues

Appellant raises three issues of alleged trial court error regarding suppression. When we review the rulings of a suppression court that are in favor of the Commonwealth, we must determine whether the record supports the court's factual findings. In so doing, we consider only the evidence of the prosecution and so much of the evidence for the defense as, when fairly read in the context of the record as a whole, remains uncontradicted. Assuming that the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. *Commonwealth v. Hughes*, 536 Pa. 355, 367, 639 A.2d 763, 769 (1994); *Commonwealth v. Cortez*, 507 Pa. 529, 491 A.2d 111 (1985), *cert. denied*, 474 U.S. 950, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985).

Initially, Appellant argues that the trial court erred in denying Appellant's pre-trial motion to suppress eyewitness

identifications. The facts underlying Appellant's assertions are as follows.

Appellant was arrested as part of the continuing chain of events on the morning of August 19, 1994. Appellant's accomplice, Anderson, was apprehended after the chase outside of Harrisburg immediately following the shooting. Anderson then led the police to Appellant. Appellant was thereafter arrested; however, his arrest was without a warrant. Following an initial appearance before a Dauphin County District Justice, Appellant was transferred to Cumberland County, and that evening, was preliminarily arraigned before District Justice Charles A. Clement, Jr. The police filed a complaint with an affidavit rider attached thereto. The rider purported to contain probable cause for the issuance of a warrant of arrest for the Appellant; however, the affidavit failed to contain most of the information known to the police, and arguably failed to state probable cause.

On August 29, 1994, a preliminary hearing was held before District Justice Clement. Evidently, prior to the introduction of evidence or the calling of witnesses, Appellant made a motion to dismiss the complaint citing the defects of the affidavit. The District Justice denied the motion. (Appellant's Brief, p. 12). Pursuant to the preliminary hearing, District Justice Clement found that the Commonwealth had established a prima facie case and bound the charges over for trial.

On September 7, 1994, Appellant filed a petition for writ of habeas corpus requesting that the charges against him be dismissed and that he be released because of the defective affidavit. By order dated September 30, 1994, Appellant's petition was denied by the trial court.

Appellant contends that the affidavit for the issuance of the arrest warrant, which was filed after Appellant's arrest, failed to set forth probable cause,[8] and therefore, violated the re-

8. Appellant does not contend that probable cause did not in fact exist, only that the affidavit for the issuance of an arrest warrant was defective. Clearly, the police had probable cause at the time of the

quirement of an adequate probable cause affidavit. Pa.
R.Crim.P. Nos. 119 and 134(a)(2) [9]. Also, Appellant asserts
that his continued confinement was unlawful because it violat-
ed the requirement of a judicial finding of probable cause [10]
within 48 hours after arrest. *County of Riverside v.
McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49
(1991).[11] Accordingly, Appellant argues that his confinement

arrest to believe that a felony had been committed and that Appellant
was one of the felons.

**9.** Effective January 1, 1995, Pa.R.Crim.P. No. 134(a)(2) was revised and
renumbered as Rule 108 as part of the reorganization of Rules 101 et
seq.

**10.** We note that a 1994 amendment to our Pa.R.Crim.P. No 140
"Preliminary Arraignment," effective January 1, 1995, now requires
that "[i]f the defendant was arrested without a warrant pursuant to
Rule 102, unless the issuing authority makes a determination of proba-
ble cause, the defendant shall not be detained." *See* Pa.R.Crim.P. No.
140(c) and the comment thereto.

**11.** In his brief, Appellant argues that a judicial finding of probable
cause was not made within 48 hours of arrest, and therefore, his
confinement was in violation of *McLaughlin.* Appellant seemingly
contends that but for the untimely probable cause determination, he
would not have been required to attend the subsequent preliminary
hearing. Appellant then goes on to argue that because he was "unlaw-
fully" detained, and therefore, "unlawfully" required to attend the
preliminary hearing, the eyewitness identifications of him at the prelim-
inary hearing were the product of the "unlawful" detention, and
therefore, these identifications should have been suppressed. The final
part of Appellant's argument appears to be that because the identifica-
tions at the preliminary hearing tainted the identifications at trial, the
court should have suppressed the identifications at trial.

In *McLaughlin,* a class action was brought alleging that the County of
Riverside's system of combining probable cause determinations and
arraignment procedures failed to provide "prompt" judicial determina-
tions of probable cause to persons arrested without a warrant. The
United States Supreme Court found that in order to satisfy the
"promptness" requirement, a jurisdiction that chooses to combine
probable cause determinations with other pre-trial proceedings must
still make a probable cause determination no later than 48 hours after
arrest. As we explain more fully below in the body of the opinion,
Appellant did receive a probable cause determination at the preliminary
hearing; thus, his contention is arguably moot.

However, even if not moot, Appellant's argument that the proper
remedy for an untimely probable cause determination is the suppres-
sion of the eyewitness identification at the preliminary hearing and at
trial is illogical. As we noted in *Commonwealth v. Garvin,* 448 Pa. 258,
293 A.2d 33 (1972), we cannot tolerate a presumption that but for an
illegal arrest, the suspect would never have been forced to face his

and appearance at the preliminary hearing, held ten days after his arrest, was unlawful and that the eyewitness identifications of Appellant by various witnesses at the preliminary hearing were tainted by his unlawful confinement and appearance. Thus, Appellant contends that the pre-trial identification procedures were so suggestive that the subsequent identifications at trial were inherently unreliable. We believe, like the trial court, that the issues of the defective affidavit and the suppression of eyewitness identifications are essentially two distinct matters. Therefore, we will treat these issues separately.

The trial court, assuming arguendo that the affidavit contained insufficient underlying facts to support probable cause, found that the probable cause issue was moot in light of the preliminary hearing in which District Justice Clement found that a prima facie case existed. The trial court reasoned that at the preliminary hearing, the Commonwealth was required to establish probable cause to warrant a belief that Appellant committed the charged offenses. Thus, because probable cause was established at the preliminary hearing, the issue became moot.

In its opinion denying Appellant's petition for writ of habeas corpus, the trial court relied upon the Superior Court case of *Commonwealth v. Croll,* 331 Pa.Super. 107, 480 A.2d 266 (1984) which in turn relied almost exclusively upon our decision in *Commonwealth v. Krall,* 452 Pa. 215, 304 A.2d 488 (1973). In *Krall,* the appellant argued that his arrest was illegal because the complaint and warrant did not provide the issuing authority with information of probable cause for arrest. Our court found that appellant could have obtained his

accusers. Moreover, *McLaughlin* speaks to the requirement of a prompt probable cause determination, but is silent as to the remedy for a violation thereof. Finally, we determine below in the body of the opinion that the eyewitness identifications of Appellant had a sufficient independent basis apart from any taint so as to render those identifications admissible. Thus, because Appellant suffered no prejudice as a result of the delayed probable cause determination, and because *McLaughlin* did not mandate such a drastic remedy, Appellant's assertion that the proper remedy for such a delayed determination is suppression of the identifications is excessive and without merit.

discharge from custody prior to disposition of his case by the issuing authority at the preliminary hearing. Because the preliminary hearing had been conducted and the magistrate determined in a neutral and independent manner that a prima facie case had been established, it was not then possible for the appellant to show that his custody was not based upon a finding of probable cause made by a judicial officer.

■ In the case at bar, we agree with the trial court's determination that upon the district justice's finding at the preliminary hearing that a prima facie case had been established, any issue concerning a defect in the affidavit became moot, and therefore, Appellant's petition for writ of habeas corpus, filed after the preliminary hearing, was properly denied.

■ Moreover, as the Commonwealth points out, Pa. R.Crim.P. No. 150 provides that a defendant shall not be discharged nor shall charges be dismissed because of any defect in the form or content of a complaint, summons, or warrant, unless the defendant raises the defect before the termination of the preliminary hearing and the defect is prejudicial to the rights of the defendant. Additionally, the comment to Pa.R.Crim.P. No. 150 notes that the Commonwealth may amend a complaint, summons, or warrant or file a new complaint against the defendant upon the finding of a defect. Thus, even if Appellant's motion concerning the defective affidavit had prevailed at the opening of the preliminary hearing and the complaint was dismissed, the Commonwealth could have, and almost certainly would have, immediately amended or filed a new complaint. Therefore, we find that Appellant was not prejudiced by the trial court's refusal to dismiss the complaint against Appellant, and thus, was not entitled to relief.

We now turn to Appellant's related argument that the identifications of Appellant at the preliminary hearing, and thus, at trial, should have been suppressed. Even assuming that Appellant was unlawfully arrested and detained, Appellant's argument is without merit.

■■■ Appellant contends that the eyewitness identifications were unreliable as a matter of law, in that, Appellant was unlawfully forced to attend the preliminary hearing and, as a result of the prejudicial circumstances of the preliminary hearing "show up", the witnesses claimed that they could recognize and identify the Appellant. However, even assuming the illegality of an arrest or a suggestive out-of-court identification, the eyewitness identifications of Appellant are not necessarily required to be suppressed. *Commonwealth v. Garvin*, 448 Pa. 258, 293 A.2d 33 (1972). We recently held that in-court identifications, despite impermissibly suggestive pre-trial procedures, are admissible if there exists an independent basis for the identifications. In *Commonwealth v. Carter*, 537 Pa. 233, 643 A.2d 61 (1994), we set forth the analysis to be used when considering the issue of an impermissibly suggestive identification. To allow an in-court identification following a suggestive pre-trial identification, the Commonwealth must establish, by clear and convincing evidence, that the identification was not a product of the events occurring between the time of the crime and the in-court identification. *Carter*, 537 Pa. at 253, 643 A.2d at 71. Therefore, an in-court identification will be permitted if, considering the totality of the circumstances, the in-court identification "had an origin sufficiently distinguishable to be purged of the primary taint." *Id.*

■■■ In determining whether an independent basis exists for the identification, the factors to be considered in this determination are: "(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation." *Id.*, at 253–54, 643 A.2d at 71.

Mindful that our scope of review is limited to a determination of whether sufficient evidence has been offered to establish an independent basis for the in-court identification, we believe that the trial court's determination concerning the in-

court identifications was supported by sufficient evidence. *Id.* at 254, 643 A.2d at 71.

In the case *sub judice*, the trial court noted that the one-on-one confrontation at the preliminary hearing as well as certain pre-trial publicity may have been suggestive. However, the trial court reviewed the testimony of various eyewitnesses to the crime. The court determined that each of the witnesses viewed the Appellant in extremely favorable circumstances. Further, the trial court credited the testimony of their ability to identify Appellant and that their identification had an independent basis, separate from any taint. Our review of the record confirms the trial court's findings.

Appellant specifically objects to the identifications made by Mr. Rishel and Mr. Michaels, both of whom testified at the preliminary hearing. The testimony at trial by Mr. Rishel, the owner of the coin shop, established that he had more than sufficient opportunity to observe Appellant. Mr. Rishel observed Appellant as he entered the coin shop. Mr. Rishel engaged in conversation with Appellant, watched him draw a revolver and ultimately knock Mr. Rishel to the ground. Mr. Rishel testified that his view of Appellant was unimpeded and that he viewed Appellant on a sunny day in a well lit room at close range. (N.T. 3/9/95 p. 96) Mr. Rishel was unwavering in his identification of Appellant. The period of time between the crime and the initial confrontation at the preliminary hearing was only ten days, although the period of time between the crime and the trial was seven months. Although the description of Appellant given to police was somewhat general (N.T. 3/3/9/95 p. 132), and the encounter somewhat brief, we find that there was sufficient evidence to support the trial court's determination that Mr. Rishel's in-court identification of Appellant had a basis independent of any suggestive encounter between the crime and the in-court identification.

Mr. Michaels, the owner of a barber shop on Fourth Avenue, testified at trial that on August 19, 1994, he watched Anderson emerge from Maple Alley. He observed Officer

Cole's arrival, Officer Cole's attempt to arrest Anderson, Appellant's later emergence from Maple Alley firing at Officer Cole, and Anderson and Appellant's escape. (N.T. 3/10/95 pp. 86–87, 89, 94–96, 104–05, and 106). Later that day, Mr. Michaels immediately announced to a friend when watching a newscast showing Appellant, "That is the shooter." (N.T. 3/10/95 p. 112). Mr. Michael gave a detailed description of Appellant. (N.T. 3/10/95 pp. 101, 112). As to the level of certainty exhibited by Mr. Michael, he identified Appellant and testified that his in-court identification was based solely on his observations at the scene of the crime. (N.T. 3/10/95 p. 113). Again, we believe that there was sufficient evidence that Mr. Michaels' in-court identification of Appellant was distinguishable from any taint.

Although Appellant does not specifically object to other eyewitnesses' identification of Appellant, he argues generally that the circumstances under which the eyewitnesses observed the perpetrators of the crime were such as to make the identifications unreliable. Our review of the record confirms the trial court's determination that the Commonwealth established that the other witnesses who testified were not induced by events occurring between the time of the crime and the in-court identification. Appellant was given the opportunity to, and did cross-examine each of the witnesses as to the accuracy of their identification. Therefore, we find Appellant's first issue on appeal to be without merit.

Next, Appellant argues that the suppression court erred in refusing to suppress a statement that he made to the police after he was arrested and following the invocation of his right to silence and counsel.

Upon his arrest and after being read his *Miranda* rights,[12] Appellant invoked his right to counsel. No interrogation was initiated by the police. Thereafter, Appellant requested that the gunshot wound to his leg, which had previously gone unnoticed by the police, be treated. Appellant was transported to Polyclinic Hospital. While at the hospital, Detective

12. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Victor Rivera, the custodial officer accompanying the Appellant, engaged in small talk with Appellant. Detective Rivera asked Appellant about his family, where he was from, and how he was feeling. (N.T. Suppression Hearing 1/13/95 p. 168; N.T. 3/14/95 p. 142).

During this conversation, Appellant asked Detective Rivera "What are my options?" to which Detective Rivera replied that he had the right to remain silent and the right to an attorney and that he could tell his attorney whatever it is that he wanted to tell him. Appellant then stated: "All I am going to say is that 'Scotty Love' did it." "Scotty Love" is an alias of Appellant's co-conspirator, Scott Anderson. Detective Rivera did not inquire as to what the Appellant meant by his statement or ask any further questions (N.T. Suppression Hearing 1/13/95 pp. 169–70; N.T. 3/14/95 pp. 142–43).

Appellant does not argue that there was anything concerning his physical or mental condition that would prohibit him from making a voluntary statement. Rather, Appellant contends that the statement was the result of unlawful police interrogation after Appellant's exercise of his right to remain silent. However, we find that the general conversation entered into with Appellant by Detective Rivera and the innocuous questions that Detective Rivera asked did not constitute interrogation.

We have held that interrogation includes express questioning as well as words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating statement. *Hughes,* 536 Pa. at 371, 639 A.2d at 771; *Commonwealth v. Whitley,* 500 Pa. 442, 457 A.2d 507 (1983). Here, Detective Rivera's small talk concerning Appellant's family and injury was merely general conversation, which is routinely attendant with a custodial relationship. No pressure was exerted on Appellant to carry on a conversation or to discuss the crime for which he was being held. Clearly, the conversation was not reasonably likely to elicit an incriminating response from the Appellant, and therefore, did not rise to the level of an interrogation.

By spontaneously asking Detective Rivera about his options, Appellant changed the subject and nature of the conversation and voluntarily initiated communication about his arrest. At that time, Detective Rivera simply readvised the Appellant of his rights and informed Appellant that he should discuss his options with his attorney.

It is well established that a gratuitous utterance, unsolicited by the police is admissible. *Hughes,* 536 Pa. at 371, 639 A.2d at 771. Having found that the Appellant's statement was not a product of police interrogation, we find that the statement was an unsolicited and gratuitous utterance, and as such, was not subject to suppression.

In the final suppression issue raised by Appellant, Appellant contends that the trial court erred in failing to suppress evidence recovered from Appellant's briefcase. After arresting Appellant, the police asked Christina Reeves, Appellant's female acquaintance, if they may search her home. On occasion, Appellant stayed overnight at Ms. Reeves' home. Ms. Reeves consented, in writing, to the search of her residence, executing a document which indicated that the police were looking for a handgun and clothing. Pursuant to the search, police found a briefcase located in Ms. Reeves' bedroom closet. Inside the briefcase was ammunition and letters addressed to Appellant.

Appellant first argues that Ms. Reeves' consent to search her residence did not cover the briefcase. Appellant asserts that because Ms. Reeves informed the police during the search that the briefcase did not belong to her, her consent was ineffective with respect to the briefcase.

The trial court found credible the testimony that the police officer who discovered the briefcase did not know to whom the briefcase belonged before he opened it and that Ms. Reeves said nothing about the search of the briefcase. (N.T. 12/28/94 Suppression Hearing p. 156). The trial court went on to state that even if Ms. Reeves did inform the police that the briefcase was not hers, which version the court rejected, such a disclaimer of ownership occurred *after* the police examined

the contents of the briefcase. The trial court's determination is supported by Ms. Reeves' own testimony that when she informed the police that the briefcase was not hers, a police officer was already removing items from the briefcase. (N.T. Suppression Hearing 12/28/94 p. 65). Our review of the testimony indicates that the trial court's findings are supported by the record.

Appellant also argues that the briefcase was a closed container for which separate authority, effective consent, or a warrant, was required prior to any search. However, our Court has held that the "scope of a search 'extends to the entire area in which the object of the search may be found' and properly includes the opening and inspection of containers and other receptacles where the object may be secreted." *Commonwealth v. Reese*, 520 Pa. 29, 33, 549 A.2d 909, 911 (1988), quoting *United States v. Ross*, 456 U.S. 798, 820–21, 102 S.Ct. 2157, 2170–71, 72 L.Ed.2d 572 (1982). Ms. Reeves voluntarily consented to a search of her entire residence, which included containers within the residence where handguns or clothing could be hidden.[13] Thus, Appellant's argument that the contents of the briefcase should be suppressed must be rejected.

**13.** Appellant's reliance upon *Commonwealth v. Timko*, 491 Pa. 32, 417 A.2d 620 (1980) and *Commonwealth v. Parker*, 422 Pa.Super. 393, 619 A.2d 735 (1993) is misplaced. Our *Timko* decision stands for the proposition that absent exigent circumstances, a warrantless search of personal property in which a person has a reasonable expectation of privacy is not permissible. Appellant ignores Ms. Reeves' consent to the search of her home which is an exception to the warrant requirement. *See Commonwealth v. Latshaw*, 481 Pa. 298, 392 A.2d 1301 (1978). Likewise, in *Parker*, the owner of an automobile consented to the search of his car by police looking for "drugs or other contraband." A cassette tape was confiscated and, based upon the contents of the tape, the owner was charged with violating Pennsylvania's wiretapping and surveillance statute. With respect to the individual's consent to search his automobile, the court found that the cassette tape was not within the scope of the consent to search for drugs, as drugs could not reasonably be stored in an audio cassette. In the case *sub judice*, the police requested Ms. Reeves' consent to search her residence for a handgun and clothing. It is beyond dispute that a briefcase is a logical receptacle for a weapon or clothing.

### Payment of Expert Witness Expenses

Appellant argues that the trial court improperly denied his motion for the payment of expert witness expenses with respect to an expert on eyewitness identification. Appellant contends that as eyewitness testimony was critical to the Commonwealth's case, an expert in the field of psychology of eyewitness testimony was necessary.

The decision to appoint an expert witness is within the sound discretion of the trial court. The trial court's determination will not be disturbed except for a clear abuse of that discretion. *Carter,* 537 Pa. at 257, 643 A.2d at 73. However, in a capital case such as this, a defendant is entitled to the assistance of experts necessary to prepare a defense. *Id.*

Here, the trial court granted Appellant's request for funding for experts in the fields of ballistics, fingerprints, serology, and hair and fiber analysis. However, the trial court denied Appellant's request for funds for experts in the fields of forensic pathology and the psychology of eyewitness testimony, thereby finding such experts to be unnecessary.

In the capital case of *Commonwealth v. Simmons,* 541 Pa. 211, 230, 662 A.2d 621, 630–31 (1995) we recently addressed the issue of whether the trial court's exclusion of an expert in the field of eyewitness identification was proper. As we stated in *Simmons,* testimony concerning the reliability of eyewitness identification by appellant's expert "would have given an unwarranted appearance of authority as to the subject of credibility, a subject which an ordinary juror can assess. Moreover, appellant was free to and did attack the witnesses' credibility and point out inconsistencies of all the eyewitnesses at trial through cross-examination and in his closing argument." *Simmons,* 541 Pa. at 230, 662 A.2d at 631.

Our analysis in *Simmons* is instructive for our determination of the necessity of an expert in eyewitness testimony. For the reasons offered in *Simmons,* we find that the trial court properly determined that an expert on the psychology of eyewitness identification was not necessary for the prepara-

tion of a defense, and that therefore, the trial court properly denied Appellant's request for expert witness fees.

### Pa. R.Crim. P. No. 352

Appellant next argues that the Commonwealth's notice of aggravating circumstances was untimely in that it was not served on Appellant at his formal arraignment as required by Pa.R.Crim.P. No. 352.

Formal arraignment in this case was held on November 5, 1994. The notice of aggravating circumstances was served on Appellant on December 16, 1994. By order dated December 19, 1994, trial was set for March 6, 1995.

At the time in question, Pa.R.Crim.P. No. 352 provided:

The Commonwealth shall notify the defendant in writing of any aggravating circumstances which the Commonwealth intends to submit at the sentencing hearing. Notice shall be given at or before the time of arraignment, unless the attorney for the Commonwealth becomes aware of the existence of an aggravating circumstance after arraignment or the time for notice is extended by the court for cause shown.[14]

As noted in the comment to Rule 352, the purpose of the rule is to "give the defendant sufficient time and information to prepare for the sentencing hearing."

It is not disputed that the Commonwealth failed to give the Appellant notice of any aggravating circumstances or even notice that the Commonwealth was seeking the death penalty at the November 5, 1994 arraignment. Appellant argues that the evidence as to all of the aggravating circumstances which were not timely noticed by the Commonwealth should be excluded and that the Commonwealth should be precluded from seeking the death penalty.

While conceding that the Commonwealth failed to notify Appellant of the aggravating circumstances until after the

14. Pa.R.Crim.P. No. 352 was amended on January 10, 1995, effective February 1, 1995. The revisions are not relevant for purposes of this appeal.

arraignment, the Commonwealth contends that its omission was a "minor transgression" and that the sanction proposed by Appellant would be inappropriate.

The trial court herein noted that not every violation of the Pennsylvania Rules of Criminal Procedure calls for the most extreme sanction. *See Commonwealth v. Mason*, 507 Pa. 396, 490 A.2d 421 (1985). Although the Commonwealth failed to comply with Rule 352, the trial court found that Appellant had constructive notice of at least one of the aggravating circumstances of the killing taking place while in the commission of a robbery. Moreover, the trial court found that in Appellant's omnibus pretrial motion, filed three days prior to the Commonwealth's written notice of aggravating circumstances, Appellant acknowledged the possibility of the death penalty phase. Thus, the trial court found that Appellant was not prejudiced in any way.

We agree with the trial court. As we stated in *Commonwealth v. Crews*, 536 Pa. 508, 526, 640 A.2d 395, 404 (1994), "Noncompliance with Rule 352 will subject the Commonwealth to appropriate sanctions. What those sanctions might be will depend on the circumstances of each case. In some cases, exclusion of evidence might be appropriate. In others, a continuance might suffice to prevent prejudice to a defendant. In other cases, such as this, no prejudice has resulted from lack of written notice, and even a continuance, denied by the trial court, was found to be unnecessary in the circumstances." Thus, as our court did in *Crews*, we find that the trial court did not commit error in the exercise of its discretion in denying the relief requested by Appellant for the Commonwealth's violation of Rule 352.

Although the Commonwealth failed to notify Appellant of the aggravating circumstances until over one month after the arraignment, it was still approximately three months before the scheduled trial date, certainly not on the eve of, or during trial. Three months was sufficient time for Appellant's counsel to prepare for the sentencing phase of trial.

This is not to say that Appellant's counsel should be required to guess as to what the Commonwealth will seek with respect to a penalty, and with respect to the death penalty, what aggravating circumstances the Commonwealth will be arguing. To characterize a failure to notify the Appellant of aggravating circumstances as a "minor transgression" is to belittle the seriousness and importance of Rule 352. However, here, Appellant's counsel was not prejudiced when notified of the Commonwealth's intentions three months prior to trial. Therefore, Appellant's argument must fail.

### *Jury Charge*

Finally, in his closing argument at the penalty phase, Appellant argued that there was confusion about who fired the shot which killed Officer Cole. In his supplemental penalty point for charge, number 2, Appellant requested that the court instruct the jury:

> If you are not convinced beyond a reasonable doubt that this Defendant personally fired the fatal shot that actually killed Officer Cole, you may consider that as a mitigating circumstance.

This point for charge was denied by the trial court. Appellant argues that the trial court erred in failing to charge the jury that it could be considered a mitigating circumstance if they were not convinced that Appellant fired the fatal shot. Appellant argues that the jury can consider any relevant factor in mitigation.

In support of his argument, Appellant relies upon *Commonwealth v. Zook*, 532 Pa. 79, 113, 615 A.2d 1, 18 (1992), *cert. denied, Zook v. Pennsylvania*, 507 U.S. 974, 113 S.Ct. 1420, 122 L.Ed.2d 789 (1993), in which the defendant argued that our death penalty statute was unconstitutional for failing to provide for a specific mitigating circumstance in the event a defendant is an accomplice and not the actual perpetrator of the killing. In *Zook*, our Court found that the statute was not unconstitutional because the list of mitigating factors provided by the General Assembly included the "catchall" category

found in section 9711(e)(8) which provides for the consideration of any evidence concerning the character and record of the defendant and the circumstances of his offense. The *Zook* court went on to state that the jury was permitted to consider an argument concerning "non-culpability" at the sentencing phase. *Zook*, 532 Pa. at 113, 615 A.2d at 18–19. It is important to note however, that in *Zook*, the trial court charged the jury on first degree murder, both on a theory of personal liability and on a theory of accomplice liability. (N.T. 1/11/90 pp. 1271, 1278–80, 1290–91).

Here however, the trial court charged the jury that to find Appellant guilty of first degree murder, they had to determine beyond a reasonable doubt that, inter alia, Appellant was the person who shot Officer Cole.[15] Thus, to find Appellant guilty of first degree murder, the jury had to find that Appellant was the individual who discharged the firearm that killed Officer Cole.

Therefore, we find that Appellant's requested charge at the penalty phase would constitute an impermissible attempt to relitigate the issue of Appellant's guilt of first degree murder. Thus, the trial court properly denied Appellant's request with respect to supplemental point for charge, number 2.

**15.** In his charge to the jury, the trial court stated in relevant part: "Now, I suggest to you that you should first consider whether the defendant was, of course, present at the scene, and whether he or one of his co-defendants [sic] discharged the firearm leading to Officer Cole's death. Once you've resolved this question then you should go on to consider the various degrees of murder, if any, or the various degree of murder, if any, in which he is guilty." ... "You may find the defendant guilty of first degree murder if you are satisfied that the following elements have been proven beyond a reasonable doubt. First, that Willis Cole is dead. Secondly, that the defendant killed him. And, thirdly, that the defendant did so with the specific intent to kill, and with malice." (N.T. 3/15/95 pp. 153–54).

The jury, after deliberating, asked for a copy of the "definition" of each degree of murder. While refusing to give written definitions, the trial court explained again the degrees of murder. Specifically, with respect to first degree murder, the trial court stated: "In other words, in order to find the defendant guilty of first degree murder, you must be satisfied that at the time of the shooting the defendant had the—number one, of course, that he was the person who shot Officer Cole, and at the time that he did so that he did so [sic] with the specific intent to kill Officer Cole." (N.T. 3/15/95 p. 181).

### *Review of Sentence of Death*

As we have rejected all of Appellant's claims for relief, we are obligated to determine whether (i) the sentence of death was the product of passion, prejudice, or any other arbitrary factor; (ii) the evidence fails to support the finding of an aggravating circumstance specified in subsection (d); or (iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant. 42 Pa.C.S. § 9711(h)(3).

 Upon reviewing the record, we determine that the sentence was not an improper product of passion, prejudice, or any other arbitrary factor, but, rather, was based upon the overwhelming evidence that Appellant murdered Officer Willis Cole. Moreover, we find that sufficient evidence was presented to support each of the four aggravating circumstances found by the jury. Appellant murdered a police officer in the performance of his duties; Appellant committed the murder while engaged in the robbery of Mr. Rishel's coin shop, a felony; Appellant knowingly created a grave risk of death to others when he fired numerous shots in the street on the morning of the robbery; and Appellant had a significant history of felony convictions involving the use or threat of violence to the person. Lastly, with respect to the final consideration, and in accordance with *Commonwealth v. Zettlemoyer,* 500 Pa. at 63, 454 A.2d at 961, this court has performed an independent review of the cases involving the sentence of death to determine whether Appellant's sentence of death was proportional to the sentences imposed in similar cases taking into consideration both the circumstances of the offense and the character and record of Appellant. We find that the sentence of death in this case is not excessive or disproportionate to the sentence imposed in like cases.[16]

16. We examined, as part of our proportionality review, the sentencing data compiled by the Administrative Office of Pennsylvania Courts (AOPC).

For the foregoing reasons, we uphold the convictions and affirm the judgment of sentence of death.[17]

17. The Prothonotary of the Supreme Court is hereby directed to transmit to the Governor's Office, within 90 days, the full and complete record of the trial, sentencing hearing, imposition of sentence, and review by our Court. 42 Pa.C.S. § 9711(i).