J-S67009-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| CALVIN BROWN | : | |
| | : | No. 3195 EDA 2015 |
| Appellant | | |

Appeal from the Judgment of Sentence October 7, 2015
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0009777-2013

BEFORE:   GANTMAN, P.J., MUSMANNO, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.:                **FILED NOVEMBER 02, 2017**

Appellant Calvin Brown appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County following his conviction at a bench trial on the charges of first-degree murder, conspiracy, carrying firearms on public streets or public property in Philadelphia, firearms not to be carried without a license, and possessing an instrument of crime.[1] Appellant contends (1) the trial court erred in denying his motion for judgment of acquittal since the evidence was insufficient to sustain his conviction on all offenses as the Commonwealth failed to prove beyond a reasonable doubt that he was the perpetrator of the offenses, and (2) the trial court erred in failing

_____

[1] 18 Pa.C.S.A. §§ 2502, 903, 6108, 6106, and 907, respectively.

_____

*   Former Justice specially assigned to the Superior Court.

to suppress Darnell Williams' in-court identification of Appellant as the perpetrator of the offenses. After a careful review, we affirm.

The relevant facts and procedural history are as follows: Appellant was arrested in connection with the shooting death of Shafiq Scott ("the victim"), and represented by counsel, he proceeded to a bench trial before the Honorable Steven R. Geroff.

At trial, Philadelphia Police Officer Joseph Campbell testified that, on November 16, 2012, he was on foot patrol with his partner, Police Officer Shawn Carroll, when, at approximately 11:45 a.m., they observed a vehicle "run a stop sign." N.T., 8/13/15, at 18. The officers motioned for the vehicle to stop, and after the vehicle complied, the officers requested back-up to assist them. *Id.* at 18-19. Officers Craig West and Mawson,[2] who were also on foot patrol, responded to assist. *Id.* at 19.

Near the conclusion of the traffic stop, the officers "heard about two to three shots in the distance, in the area of 60th and Springfield [Streets]." *Id.* As the four officers began to walk to the area, they "heard multiple shots, continuous shots; three, four, five, six, seven." *Id.* At this point, the officers began running towards the area, and upon arrival at 60th and Springfield Streets, they discovered the victim, who was unresponsive and lying on the

---

[2] Officer Mawson's first name has not been provided to this Court.

ground with a silver handgun between his legs. *Id.* at 20. They also observed several bullet holes in a nearby parked black Pontiac. *Id.*

Officer Campbell called for medical assistance, reported on the radio that there had been a shooting, and remained with the victim. *Id.* Meanwhile, the other officers began circulating in the area, looking for suspects and witnesses. *Id.* at 21. The victim was pronounced dead at 12:15 p.m., and the firearm was seized by the crime scene unit shortly thereafter. *Id.* Officer Campbell confirmed that he obtained from the other officers the name, address, and phone number of a witness to the shooting, Linda Chappelle. *Id.* at 20-21, 23, 25.

Officer West testified that, upon arrival at the scene of the shooting, Ms. Chappelle apprised him of potential suspects and gave a description of two black males, one of whom was wearing a black hoodie and the other of whom was wearing a gray hoodie. Acting on this information, as well as witnesses pointing towards the breezeway between Springfield and Belmar Streets, Officers West and Mawson began searching for the suspects. N.T., 10/17/15, at 6-12. At 59th Street, a patrol car picked up the officers, and they surveyed the immediate area. *Id.* During the search, Officer West again observed Ms. Chappelle on the street, and at this time, took down her name and contact information. *Id.* at 11. Ms. Chappelle told Officer West that she could identify the shooters. *Id.* at 11-12. She also elaborated that she knew the suspects and the victim. *Id.* at 17.

Ms. Chappelle admitted at trial that she did not want to testify, she was in custody awaiting a violation of probation hearing in Montgomery County, and she had an open criminal case in Philadelphia County. *Id.* at 21-23. She admitted the Commonwealth had made no promises or deals in exchange for her testimony. *Id.* at 24-25.

Before the prosecutor could properly pose a question about the date in question, Ms. Chappelle interjected, "I don't remember. I was bandaged up. I was high. I don't remember." *Id.* at 25. She indicated that she was trying to change her life and she did not want to get in more trouble. *Id.* at 26. When asked about events occurring on November 16, 2012, Ms. Chappelle claimed that she did not remember where she was on November 16, 2012, and that she didn't "even remember 2012." *Id.* at 26-29. She denied knowing the victim, but admitted that she knew Appellant and his family, who "looked out" for her. *Id.* at 27. Ms. Chappelle indicated that, by asking her to testify, the court was "going to get [her] fucked up. This is some real vicious shit right here." *Id.* at 28.

Ms. Chappelle denied giving a statement to homicide detectives on December 3, 2012, regarding the shooting. *Id.* at 31. However, when shown the statement, she confirmed that the signature at the bottom of each page of the statement, as well as her signature on a photograph of Appellant and a statement of adoption of attestation, was her signature; however, she indicated she was "forced" to affix her signature thereon. *Id.* at 30-32.

- 4 -

The statement, which was reviewed at trial, revealed that Ms. Chappelle knew the victim for about ten years, she used to live with Appellant's father, and she used to purchase drugs from Appellant when he would visit. *Id.* at 32, 42. In the statement, Ms. Chappelle confirmed she was at the scene of the shooting and described the events as follows:

> I was coming from the store and I was walking from Chester Avenue to Springfield Avenue from the deli. I saw one guy I know as Cal standing in front of the barbershop.
>
> ***
>
> [The victim] was standing on my side of the street. All of [a] sudden, I heard gunshots and I ducked on the side of the gate on Trinity Street. I then saw Cal and another male that had a blue mask on his face and hoodie running. I looked over and saw Cal and the other boy shooting at [the victim]. I saw them shoot about two or three times.
>
> ***
>
> I saw them shoot about two or three shots at [the victim]. I saw them put their guns in the waist of their pants and they ran down the driveway of 60th and Springfield. [The victim] was running in front of a car. The crowd start[ed] gathering around and the police came right away.

*Id.* at 33-34.

Moreover, in the statement, Ms. Chappelle described "Cal" as "[a] black male, light skin, wavy black hair, little beard with sideburns, about five-foot-six, thin build. He was wearing a black hood[ie] and black pants." *Id.* at 34-35. She also noted in the statement that Cal's gun "looked like an automatic[,]" she did not know why Cal shot the victim, and she heard no conversation between the men. *Id.* at 35, 37, 40. Additionally, she noted in the statement that, at the time of the shooting, she was standing at a driveway

at Trinity Street, "right before you get to 60th and Springfield [Streets]…where the shooting happened." *Id.* at 41.

Although Ms. Chappelle denied at trial that she had signed her name on a photograph of Appellant at the homicide station and wrote the name "Cal" at the top, she admitted at trial that the photograph in question was a photograph of Appellant. *Id.* at 43-44. Ms. Chappelle testified she did not want to cooperate with the Commonwealth because she is "no fucking snitch." *Id.* at 46.

Detective Derrick Venson testified that he, along with Detective Kevin Judge, took a verbatim statement from Ms. Chappelle on December 3, 2012, at approximately 6:40 p.m. *Id.* at 70-71. Detective Venson confirmed that Ms. Chappelle signed the bottom of each page of the statement, as well as a photograph of Appellant and a statement of adoption of attestation. *Id.* at 72. He indicated that she did not appear to be under the influence of drugs or alcohol at the time of the statement, she gave the statement of her own free will, and the statement constituted "her words" verbatim. *Id.* at 73-74. Detective Venson confirmed that Ms. Chappelle identified the person referred to as "Cal" in her statement as Appellant. *Id.* at 79. He noted that she identified Appellant's photograph in his presence and she reviewed each page of her statement without making any corrections thereto. *Id.* at 79-80.

Darnell Williams testified that she was reluctant to testify; however, she admitted that she was inside of a residence near the scene of the shooting on

the date and time in question. *Id.* at 91-92. She testified that she heard gunshots, and when she looked out of a window, she observed a man holding a gun in his hand. *Id.* at 93. The man was shooting the gun down toward the ground where another man was lying on the ground by a car. *Id.* She further testified that another man, whom she identified at trial as Appellant, was calling for the man, who was standing, to "go before the cops come." *Id.* at 94. The man who was standing walked towards Appellant, and Appellant then "walked up and shot the victim." *Id.* at 95.

Ms. Williams confirmed that she saw Appellant's gun and it was a handgun. *Id.* She also confirmed that Appellant shot his gun until it "was empty." *Id.* Thereafter, both men ran down the alley between Belmar and Springfield Streets, while the victim remained lying in the street. *Id.* at 96-98. Ms. Williams confirmed that, during the shooting, she called 911, describing what she was witnessing. *Id.* at 100.

Ms. Williams testified that she gave a statement to the homicide unit, and she confirmed that, from a police photographic array, she identified Appellant as the second man she saw shoot the victim. *Id.* at 101-03. She also testified that, on March 24, 2014, she attended a line-up and indicated that she believed "number two" was involved in the shooting; however, she also testified that, after the line-up, she informed ADA Kirk Handrich that she may have made a misidentification. *Id.* at 106-08. Ms. Williams testified that she did not know either the victim or Appellant. *Id.* at 109.

Detective Judge confirmed that he interviewed Ms. Williams on December 14, 2012, and Ms. Williams informed him that she had seen one of the shooters. N.T., 8/19/15, at 5-6. Accordingly, Detective Judge prepared a photographic array, and he confirmed that Ms. Williams pointed to Appellant's photograph, indicating he was one of the shooters. *Id.* at 7.

Police Officer Thomas D'Alesio testified that on November 18, 2012, at approximately 12:50 p.m., he was on patrol when he observed Derrell Hill standing outside of an abandoned rooming house. *Id.* at 145-46. Officer D'Alesio detected a bulge in the front of Mr. Hill's sweatshirt, and believing the bulge to be that of a gun, Officer D'Alesio exited his vehicle with the intent of approaching Mr. Hill. *Id.* at 145. Mr. Hill ran into the abandoned rooming house with Officer D'Alesio chasing him. *Id.* Two other males, Clinton Robinson and Robert Womack, were sitting on a couch in the abandoned building. *Id.* Mr. Hill discarded a handgun, which Officer D'Alesio seized, and the officer later discovered that the firearm had been used in the murder of the victim less than forty-eight hours earlier. *Id.* at 144-45, 149, 153, 160-61. Moreover, Officer D'Alesio seized a handgun from a box spring in the abandoned building, and it was later determined that this handgun was also used in the murder of the victim. *Id.* at 149, 153, 161.

Detective James Dunlap testified that he examined call-detail records for Clinton Robinson for the time period between November 5, 2012, to November 20, 2012. N.T., 8/18/15, at 14-15. The records revealed phone

calls between Mr. Robinson and Appellant, including calls on the day of the murder, as well as two days thereafter. *Id.* at 13-14, 17-21.

At the conclusion of the testimony, the trial court convicted Appellant of the offenses indicated *supra*, and on October 7, 2015, the trial court sentenced Appellant to life in prison. This timely appeal followed, and all Pa.R.A.P. 1925 requirements have been met.

Appellant first contends the trial court erred in denying his motion for judgment of acquittal since the evidence was insufficient to sustain his conviction on all offenses as the Commonwealth failed to prove beyond a reasonable doubt that he was the perpetrator of the offenses.

Initially, we note, at the conclusion of the trial testimony, Appellant's counsel made an oral motion for judgment of acquittal pursuant to Pa.R.Crim.P. 606(a)(2). This motion challenged the sufficiency of the evidence.

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be

considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Brooks***, 7 A.3d 852, 856-57 (Pa.Super. 2010) (citations omitted).

Here, Appellant's sufficiency argument at trial and on appeal is specific in nature. Specifically, he avers the evidence was insufficient to prove that he was, in fact, the person who committed the crimes. As such, we need not conduct a thorough review of the evidence to determine whether it can support a finding that all of the elements have been met. Rather, we will focus on the specific issue raised by Appellant: whether the evidence was sufficient to establish that Appellant was the perpetrator of the crimes.

In addressing Appellant's sufficiency of the evidence claim, the trial court relevantly indicated the following in its Rule 1925(a) opinion:

> A review of the evidence presented at trial shows that the Commonwealth proved beyond a reasonable doubt that [Appellant] was indeed the perpetrator. Two eyewitnesses, Ms. Chappelle and Ms. Williams, observed, from different vantage points, [Appellant] (in tandem with another individual) fire multiple shots at the [victim] and [then] flee down the same driveway [together]. As the [trial court] noted, this "case boils down to credibility…with regard to the [police] statement of Linda Chappelle and the testimony of Darnell Williams." (N.T., 8/19/15, [at] 66).
>
> ***
>
> Here, Ms. Chappelle's statement to [the] homicide [detectives] indicated that she knew both the victim [ ] and [Appellant] (whom she called Cal). She confirmed being at the scene of the shooting on November 16, 2012, at about 11:43 a.m.; she was on the same side of the street as the [victim][.] [She] described that she saw [Appellant] and the other individual

- 10 -

(who was wearing a blue mask) shoot at the [victim] then put [their] guns in the waists of their pants and run down the driveway of 60th and Springfield Streets. She also indicated that [ ] she heard [numerous] gunshots. Furthermore, [in her statement,] Ms. Chappelle provided a detailed description of [Appellant] as well as the firearm which he used.

Although at trial Ms. Chappelle denied making a statement [to the] homicide [detectives] and claimed that she did not remember anything with regard to the shooting, her prior statement [to the] homicide [detectives, which was signed and adopted by her, were properly considered by the court]. Th[e] court is satisfied that Ms. Chappelle's statement [to the] homicide [detectives] can in no way be discounted and does come in as substantive evidence[.]

Ms. Darnell Williams, who notified police of the shooting, testified at trial consistently with her statement [to the] homicide [detectives]. While at a lineup conducted approximately one year and five months after the shooting she made a misidentification of [Appellant], Ms. Williams picked out [Appellant's] photo [from] a photo array in close temporal proximity to the incident ([approximately] one month after the shooting) and provided an in-court identification of [Appellant] at trial. Th[e] [trial] court finds Ms. Williams to be a credible and reliable witness.

In addition, two days after the shooting, Officer D'Alesio encountered Mr. Derrell Hill, who had a bulge in his pocket, on the 5900 block of Windsor Street, just a couple of blocks away from the crime scene. When the officer exited the police vehicle, Mr. Hill ran into a rooming house at 5907 Windsor Street, entered a room in which Clinton Robinson and a man named Womack were seated, threw a gun under a bed and struggled with the police. The police recovered that handgun and a second gun which was under a box spring. Although the DNA evidence did not link [Appellant] to either firearm,[3] cell phone records showed that [Appellant] and Clinton Robinson had extensive contact with each other. It was determined that both firearms were used to kill the [victim].

---

[3] At trial, Benjamin Safeer Levin, an expert in DNA analysis, indicated that he analyzed swabs taken from the two firearms seized by Officer D'Alesio, but that there was an insufficient amount of DNA evidence on the guns to generate a full DNA profile. N.T., 8/18/15 at 89-92, 95-96.

- 11 -

> After considering all [of] the evidence and the applicable law, [the trial] court is satisfied that the Commonwealth established beyond [a] reasonable doubt that [Appellant] was the perpetrator of the offenses for which he stands convicted.

Trial Court Opinion, filed 11/28/16, at 22-23 (footnote added) (footnote omitted).

We agree with the trial court's analysis in this regard, and applying the requisite standard of review, we conclude the evidence was sufficient to establish Appellant, along with a co-conspirator, shot the victim. *See Brooks*, *supra*.

We acknowledge, as Appellant points out on appeal, that the record demonstrates the Commonwealth's two eyewitnesses, Ms. Chappelle and Ms. Williams, were reluctant to testify, and particularly with regard to the former, the Commonwealth relied upon her pre-trial police statement in which she positively identified Appellant as the shooter approximately one month after the shooting. However, we remind Appellant that the trial court, as the finder of fact, was free to weigh the eyewitnesses' demeanor, trial testimony, and pre-trial statements to detectives in determining Appellant's guilt. *See id.* The fact the trial court's credibility determinations do not favor Appellant's version of events does not render the evidence insufficient in this case. *See id.*

Further, we acknowledge that there was no DNA evidence linking Appellant to the guns at issue, and the cell phone records linking Appellant to Clinton Robinson constitutes circumstantial evidence of guilt. However, as

- 12 -

this Court has held, the absence of an appellant's DNA does not preclude the fact finder from finding that he committed the crime. *See Commonwealth v. Brooks*, 875 A.2d 1141, 1147 (Pa.Super. 2005) (noting that "[i]n DNA as in other areas, an absence of evidence is not evidence of absence."). Also, as our Supreme Court has held, "circumstantial evidence is sufficient to sustain a conviction so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v. Chambers*, 528 Pa. 558, 599 A.2d 630, 635 (1991) (quotation and quotation marks omitted). Simply put, the evidence was sufficient to prove Appellant shot the victim.

Appellant's next contention is that the trial court erred in failing to suppress Ms. Williams' in-court identification of him as one of the shooters where her out-of-court photo identification was unduly suggestive. He further claims that Ms. Williams' in-court identification did not have any independent origin such that it was not purged of the primary taint.[4]

Initially, we note:

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.
>
> [W]e may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole.

---

[4] The record reveals Appellant filed a motion to suppress Ms. Williams' in-court identification, and he offered argument thereon. N.T., 8/19/15, at 8-10. The trial court denied the motion. *Id.* at 10.

> Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts. Moreover, it is within the lower court's province to pass on the credibility of witnesses and determine the weight to be given to their testimony.

*Commonwealth v. Jaynes*, 135 A.3d 606, 610 (Pa.Super. 2016) (quotation and quotation marks omitted).

A photographic identification is unduly suggestive if, under the totality of the circumstances, the identification procedure creates a substantial likelihood of misidentification. *Commonwealth v. DeJesus*, 580 Pa. 303, 860 A.2d 102, 112 (2004). Photographs used in photo array line-ups are not unduly suggestive if the suspect's picture does not stand out more than those of the others, and the people depicted in the array all exhibit similar facial characteristics. *Commonwealth v. Fisher*, 564 Pa. 505, 769 A.2d 1116, 1126 (2001). The photographs in the array should all be the same size and should be shot against similar backgrounds. *See id*.

When an out-of-court identification is alleged to be tainted, an in-court identification may still stand if, again considering the totality of the circumstances, the identification had an origin sufficiently distinguishable to be purged of the primary taint. *Commonwealth v. Abdul-Salaam*, 544 Pa. 514, 678 A.2d 342 (1996). The factors a court should consider in determining whether there was an independent basis for identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior

description of the criminal; (4) the level of certainty demonstrated by the witness during the confrontation; and (5) the length of time between the crime and the confrontation. ***See id.***

In the case *sub judice*, Appellant baldy asserts the pre-trial identification photo procedure was unduly suggestive. ***See*** Appellant's Brief at 8. That is, he begins his argument with the premise that the pre-trial identification procedure was unduly suggestive and tainted, however, he has not developed an argument or pointed to factors in support of his argument. ***Id.***

As this Court has held, where there is no evidence that the out-of-court identification proceedings were tainted, we need not reach the second question of whether the in-court identification is inadmissible based on the suggestiveness of the out-of-court identification and lack of an independent basis. ***Jaynes***, 135 A.3d at 610 (holding that where a defendant does not show that improper police conduct resulted in a suggestive identification, suppression is not warranted); ***Commonwealth v. Fulmore***, 25 A.3d 340, 349 (Pa.Super. 2011). Accordingly, since Appellant has not properly developed an argument that Ms. Williams' out-of-court photo identification was based on an unduly suggestive identification procedure, we find no relief

is due on his claim that Ms. Williams' in-court identification should have been suppressed.[5]  ***See id.***

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

*Joseph D. Seletyn*

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/2/2017

_____

[5] We note Appellant argues Ms. Williams' in-court identification was lacking credibility since her viewing of the photo array was 29 days after the shooting, she was in shock during the shooting, the sun was in her eyes during the shooting, and she previously misidentified the shooter during a line-up. Appellant's Brief at 8-9.  These factors are relevant to the overall credibility of Ms. Williams' in-court identification; however, as indicated *supra*, the trial court weighed these factors and found Ms. Williams' in-court identification to be credible.  This was within the trial court's province.  ***See Commonwealth v. Kyle***, 533 A.2d 120, 132 (Pa.Super. 1987) (holding issue of credibility of an in-court identification is separate from issue of whether the in-court identification should be suppressed).