J-S01038-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| JEREMY O'GROSKY | : | |
| | : | |
| Appellant | : | No. 418 WDA 2025 |

Appeal from the PCRA Order Entered March 10, 2025
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s):  CP-65-CR-0003943-2015

BEFORE:   BOWES, J., PANELLA, P.J.E., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:              **FILED: March 10, 2026**

Appellant Jeremy O'Grosky files this *pro se* appeal from the order of the
Court of Common Pleas of Westmoreland County denying his petition pursuant
to the Post Conviction Relief Act (PCRA).[1]  Appellant raises numerous claims
of the ineffectiveness of his trial counsel.  After careful review, we affirm.

Appellant was charged with the June 17, 2014 armed robbery of the
First Commonwealth Bank in Salem Township.   The factual background
presented at Appellant's jury trial was previously summarized as follows:

> Alicia Aiello testified that she was working as a teller at First
> Commonwealth Bank on June 17, 2014. She stated that during
> her shift at approximately 2 p.m., she noticed a male enter the
> bank who "was dressed like it was winter" despite the warm
> temperature that day. He was wearing a turtleneck sweater, coat,
> hat, and sunglasses. This struck Aiello as odd, and she testified
> that "my first thought was he was a robber." At that point, he

---

[*] Former Justice specially assigned to the Superior Court.
[1] 42 Pa.C.S.A. §§ 9541-9546.

approached her teller station and had money in hand as if he was prepared to make a deposit. He then began to "fumble" around in a messenger bag, pull out a folder, and place it on the counter. He then opened the folder and "was stuttering a little bit." At that point, Aiello noticed that the man was pointing a gun at her. He demanded that Aiello give him all of the money at her station. She obliged, and gave him all of the money in her drawer. Aiello described the gun as black in color and "very similar in the shape and size of a Glock." She also testified that the man appeared to be under the influence of drugs. Aiello stated that his skin color also struck her as odd. She testified:

> ... my first thought it was very unusual because of the color of his skin. He just didn't look normal. It looks like he was ... African American but he didn't have the features. He just was very odd to me. It stuck out to me. He had facial hair on his face but it just didn't look normal to me, like, either it looked like it was almost painted on or to cover up. If he is robbing a bank he doesn't want people to see his features. I get that. That's what it appeared to me, that it was put there and it was not normal.

She also testified that the man had "the beginning markings" of a tattoo on his left hand. Aiello stated that she handed the man approximately 700 dollars. She estimated his height as "average, maybe a little taller." She stated that she was frightened during the robbery, and she felt that she would be hurt if she did not comply with his demands.

....

Alesha McGough testified that on June 17, 2014, she was employed as a drug and alcohol treatment counselor at Mon-Yough Community Services ["Mon-Yough"]. On that date, [Appellant] was scheduled for an appointment with McGough at 2:30 p.m. McGough testified that [Appellant] did not arrive until 2:45 p.m. When he arrived, he was wearing a "wife-beater" shirt and brown cargo pants and was wearing flip flops. She testified that when he arrived, he informed the front desk staff that he wanted to meet with McGough. McGough met him in the front lobby.

[Appellant] informed her that he could not stay to formally meet with her because his girlfriend was waiting for him outside and he had to leave because he had been working all day. She stated that he appeared to be "rather agitated, kind of hyper ... he wouldn't

sit down in the lobby, he was kind of pacing around." She testified that while he was "usually kind of hyper," his behavior that day was "more over the top." She then walked him to the front door, and observed him entering the passenger side of a silver-gray four-door sedan. McGough estimated that in total, [Appellant] was at the facility for less than [five] minutes. She stated that she did not observe any discoloration to his skin on that day, and that he "looked like he was clean."

Amanda Crusan testified that she had a romantic relationship with [Appellant] for approximately [one] year, which began in May 2013. In January 2014, Crusan and [Appellant] moved into an apartment together in Clairton, Allegheny County. During their relationship, Crusan was a heroin user, and would use [five to ten] stamp bags of heroin per day. Crusan testified that as of the time of trial, she was no longer was using heroin. She also testified that while the pair were living together, both of them were unemployed and were struggling financially. Crusan testified that [Appellant] was also a heroin user, and that they both purchased heroin from a man named Malcolm.

In June 2014, Crusan stated they owed a drug debt to Malcolm, and their utilities had been shut off as they had not been paid. To solve their financial issues, [Appellant] suggested to Crusan that they should rob a bank. At first, Crusan did not take his suggestion seriously, until he suggested it again a few weeks later. [Appellant] told Crusan that he would have to alter his appearance using makeup so that there would be a possibility that "he could get away with it." Although the two did not discuss what bank they were to rob, they traveled to Walgreen's in Lower Burrell approximately one week prior to the robbery. [Appellant] stole concealer, makeup applicators, and mascara.

At that point, their plan to rob a bank began to fully form. [Appellant] stated that they should use a rental car, and after the robbery, he would lay in the trunk so that he could remove the makeup, shave his beard, and change his clothes. Crusan purchased a gallon of water, razors, and makeup remover at Wal-Mart approximately [two] days before the robbery. Around that time, [Appellant] decided that he would rob First Commonwealth Bank in Salem Township. [Appellant] and Crusan slept at [Appellant's] father's home on the nights leading up to the robbery. They returned to their apartment on the morning of June 17, 2014 to prepare for the robbery. Crusan testified:

... we started getting prepared for him to rob a bank. We put on the concealer, covered up his neck and his face and then used mascara to change the color of his hair. He ... wore a black windbreaker suit, pants with matching coat and white shirt underneath it, and he had wrapped, I don't know if it was a white shirt or tank top, around his neck to conceal the tattoos on his neck.

Crusan stated that she applied mascara to his hair and beard, and ensured that all of his exposed skin was covered with makeup. [Appellant] also was wearing sunglasses before he left the residence. Crusan stated that she was already in possession of a rental car, a silver Kia, as she had crashed her car approximately two weeks prior to that date. [Appellant] was also in possession of a black BB gun when he left the residence, although she did not believe that he would use it during the commission of the robbery.

When Crusan and [Appellant] arrived at the bank, Crusan testified that she parked in a parking lot of a McDonald's adjacent to the bank. At that point, Crusan made a phone call to 9-1-1 using a cell phone that was no longer in service. She stated that "I had called and I said that my name was Sara and ... my neighbor was threatening to shoot my dog and that I needed police assistance." When the 9-1-1 operator asked Crusan for her phone number, she hung up and removed the battery from the phone. At some point during the phone call, [Appellant] exited the vehicle and walked in the direction of the bank.

When [Appellant] returned to Crusan's vehicle, he entered the trunk. He remained in the trunk for approximately 20-25 minutes. When [Appellant] climbed back into the front seat from the trunk, Crusan stated that she was on SR 30 in North Versailles, Allegheny County. Crusan stated that [Appellant] had changed his clothes and was wearing plaid shorts and a white tank top. He had shaved his head and face, and removed the makeup. He was also wearing flip-flops. [Appellant] counted the money he had recovered at the bank, and relayed to Crusan that he had recovered approximately 700 dollars.

Crusan stated that they eventually arrived at the drug and alcohol counseling center for [Appellant's] appointment. [Appellant] entered the facility and returned approximately [five] minutes later. Crusan then drove [Appellant] to his mother's house in Elizabeth, Allegheny County. Crusan testified that she believed that [Appellant] disposed of the clothing he used in the

commission of the robbery at his mother's house. [Appellant] also met with Malcolm, who sold him heroin, and paid him the debt which was owed to him. Crusan stated that [Appellant] gave all of the money he received during the robbery to Malcolm.

A few days after the robbery, Crusan spoke to Trooper Gross [in an interview following a] traffic stop. Trooper Gross showed her photographs taken from surveillance footage during the robbery. When Trooper Gross asked her whether she knew who had robbed the bank, Crusan replied that it was probably a hitchhiker that she had picked up earlier in the day on June 17, 2014. She informed Trooper Gross that she (sic) had picked up the hitchhiker at Sheetz on Mosside Boulevard in Monroeville. She stated that after she picked up the hitchhiker, she drove toward Vandergrift to visit her children. She told the trooper that the hitchhiker "looked like a Muslim." She also stated that she dropped the hitchhiker off at the McDonald's in Delmont. She told the trooper that [Appellant] had been at his mother's house at the time of the robbery because he had a drug and alcohol appointment later that day. She told Trooper Gross that she never made it to Vandergrift, and turned around to pick up [Appellant] for his appointment. She testified at trial that she told Trooper Gross that the hitchhiker was Muslim for the following reason:

> ... we had discussed what had happened at the bank [and] [Appellant] told me that he used ... an accent that would have - that somebody was Muslim would have sounded like, like, somebody from - I don't [know], like, Iraq or Afghanistan, like, that area. He said he sounded like that. That's why I said he was Muslim.

Crusan said that when she talked to Trooper Gross, nothing in her story was the truth.

After "a substantial period of time," Crusan went back to the police, though neither she nor [Appellant] had been charged with the bank robbery. Crusan stated: "At that point I was clean and my mind was clear. I had a lot of time to think about it, about my family, about my kids, and it was the right thing to do." She traveled to the Vandergrift Police Department and spoke with Corporal Fennell of the Pennsylvania State Police and informed him of what transpired.

....

Brian Gross, retired Trooper for the Pennsylvania State Police, testified that the first time he spoke with Amanda Crusan [she]

- 5 -

had informed him that she picked up a Muslim hitchhiker the day of the bank robbery. When Gross asked her [to] repeat her story, she again told him about the Muslim hitchhiker.

Gross stated that he conducted searches of [Appellant] and Crusan's vehicles and the pair's residence on June 21, 2014. From Crusan's vehicle he recovered aviator sunglasses and a backpack. He also located a disposable razor in the driver side door, and on the floor. At the residence, Gross recovered dark-colored makeup and a black messenger bag.

The parties agreed to the following stipulation:

On the afternoon of June 19, 2014, Patrolman Nathan Rigatti of the Vandergrift Police Department conducted a traffic stop of a silver Kia Forte. The vehicle had been rented by Amanda Crusan and was being operated by [Appellant] with Amanda Crusan in the passenger seat.[2] The Vandergrift Police notified the Pennsylvania Board of Probation and Parole of the traffic stop, and then later notified the Pennsylvania State Police at Kiski.

Joyce Douglass, state parole agent, testified that in June 2014, she was supervising [Appellant]. As a result of the traffic stop involving [Appellant] on June 19, 2014, Douglass conducted a parole search at [Appellant's] residence on the same date. Upon arrival, she recovered a CO2 pistol from [Appellant]'s living room. Douglass explained the pistol resembled a Glock pistol. Douglass later learned that the CO2 pistol had been destroyed so that it was unavailable at trial.

***Commonwealth v. Ogrosky***, 1705 WDA 2017, 2018 WL 4997960, at *1–4

(Pa.Super. Oct. 16, 2018) (unpublished memorandum) (*quoting* Trial Court

Opinion (T.C.O.), Trial, 10/25/17, at 2-9 (footnote and citations omitted)).

---

[2] During the June 19, 2014 traffic stop, Appellant and Crusan were taken into custody after they were found to be in possession of a significant amount of heroin. While the jury deciding Appellant's robbery charges in the instant case was not informed of this separate criminal case against Appellant and Crusan, these circumstances are relevant to some of Appellant's claims on appeal as discussed *infra*.

- 6 -

On April 5, 2017, Appellant proceeded to a jury trial in which he was represented by Attorney Marc Daffner ("trial counsel"). At the conclusion of the trial, the jury convicted Appellant of robbery, conspiracy to commit robbery, and theft by unlawful taking. On July 6, 2017, the trial court sentenced Appellant to a mandatory term of ten to twenty years' imprisonment.[3] On October 16, 2018, this Court affirmed the judgment of sentence. Appellant did not file a petition for allowance of appeal.

On July 14, 2019, Appellant filed a timely *pro se* PCRA petition. Although Appellant was appointed counsel, he then privately retained Tim Dawson, Esq. ("Attorney Dawson"), who filed multiple amended PCRA petitions. Appellant's petitions predominately contain ineffectiveness claims against trial counsel. The PCRA court set forth the following procedural history of Appellant's representation throughout the collateral proceedings:

> Multiple PCRA Evidentiary Hearing[s] were also held before [the PCRA] Court. Throughout the litigation of the instant PCRA petition, objections were raised regarding [Appellant's] attempts at hybrid representation. [The PCRA court] agreed that [Appellant] was not entitled to hybrid representation resulting in [Appellant] at times deciding to represent himself.
>
> The first PCRA Evidentiary Hearing occurred on March 15, 2022. At that hearing, [Appellant] testified regarding [trial counsel's] representation of him throughout his case. [Appellant] was represented by Attorney Dawson throughout the hearing.
>
> A second PCRA Evidentiary Hearing occurred on August 11, 2022. Based on [Appellant's] wishes, Attorney Dawson was

_____

[3] The Commonwealth sought the imposition of this mandatory sentence pursuant to 42 Pa.C.S.A. 9714(a)(1) given that Appellant had a prior conviction for a crime of violence.

appointed as standby counsel, and [Appellant] represented himself. The Commonwealth presented testimony from Magisterial District Judge Rebecca Tyburski ("MDJ Tyburski") and [trial counsel] at the hearing.

A third PCRA Evidentiary Hearing occurred on December 13, 2022. At that hearing, [Appellant] indicated that he wished to have Attorney Dawson appointed as counsel again. [The PCRA court] agreed, and [Appellant's] case was continued.

A fourth PCRA Evidentiary Hearing occurred on April 27, 2023. At that hearing, the parties continued with the testimony of [Appellant] and [trial counsel]. [Appellant] was represented by Attorney Dawson during the hearing.

A fifth and final PCRA Evidentiary Hearing occurred on August 29, 2023. At that hearing, [Appellant] intended to present testimony from his sister, Lauren Ogrosky, for purposes of admitting the video recorded interview pertaining to his alibi witness claim that was taken after trial of his deceased mother, Terri Ogrosky. [The PCRA court] ultimately did not allow the video to be admitted into evidence since it contained inadmissible hearsay.

[Appellant's] case was taken under advisement at the conclusion of the hearing, and briefs were ordered. Both parties submitted briefs to [the PCRA court], however, [Appellant] submitted both *pro se* and counseled briefs that were conflicting. On August 22, 2024, [the PCRA court] ordered [Appellant] to submit a final brief from Attorney Dawson including all of [Appellant's] claims. [Appellant] thereafter indicated that he wished to represent himself. A ***Grazier*** hearing was held before [the PCRA] Court on October 15, 2024, and [Appellant] was permitted to proceed *pro se*. He indicated that he wished for [the PCRA] Court to review his *pro se* brief that was already filed of record. The Commonwealth thereafter submitted a Supplement to its Brief in Opposition to [Appellant's] PCRA Petition on December 10, 2024.

PCRA Court Opinion (P.C.O.), 3/10/25, at 4-5.

On March 10, 2025, the PCRA court entered an order and opinion dismissing Appellant's PCRA petition. This timely appeal followed.

On April 29, 2025, the PCRA court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant did not file a Rule 1925(b) statement, but instead filed a *pro se* correspondence indicating that he had not received any of the PCRA court's orders at SCI Greene, where he is currently incarcerated. Appellant averred that family members had informed him that court documents in this case were being sent to the former residence of his deceased mother.

We note that the PCRA court's 1925(b) order states that it would be sent to Appellant at SCI Greene. However, the docket sheets in this case do not contain any indication that the Rule 1925(b) order was sent to Appellant, who had elected to represent himself at that point in the litigation. Instead, the docket sheets show the Rule 1925(b) order was sent to Attorney Dawson, who was no longer representing Appellant.

Our Court has stated that "[i]f the [trial court] docket does not show that notice of the entry of a Rule 1925(b) order was provided to an appellant, then we will not conclude that the appellant's issues have been waived for failure to file a Rule 1925(b) statement." **Commonwealth v. Andrews,** 213 A.3d 1004, 1009–1010 (Pa.Super. 2019) (*quoting* **In re L.M.**, 923 A.2d 505, 510 (Pa.Super. 2007)). As the docket in this case does not show that Appellant was provided notice of the Rule 1925(b) order, we decline to penalize Appellant for his failure to file a Rule 1925(b) statement.

Appellant raises the following issues for our review on appeal:

1. Did the PCRA court err where counsel failed to present evidence of Appellant's tattoos, size/weight, and other physical characteristics to contradict eyewitness descriptions of the robber?

2. Did the PCRA court err in denying relief where trial counsel failed to investigate, subpoena, and present exculpatory physical evidence (drug tests, logbook, maps, photographs, vehicle specifications) directly contradicting the Commonwealth's theory?

3. Did the PCRA court err in denying relief where trial counsel failed to investigate and present alibi witnesses (Appellant's mother, now deceased) and corroborating records such as the Mon-Yough logbook?

4. Did the PCRA court err where trial counsel failed to file and litigate a suppression motion concerning an affidavit of probable cause that contained false statements and omissions, and where no search warrant was produced despite repeated judicial inquiry?

5. Did the PCRA court err where counsel failed to cross-examine and impeach key Commonwealth witness Amanda Crusan with letters and contradictory prior statements?

6. Did the PCRA court err where counsel failed to protect Appellant's right to testify and abruptly rested without presenting any defense evidence?

7. Did the PCRA court err in denying relief despite the cumulative effect of counsel's errors, which rendered the verdict unreliable under **Strickland v. Washington**, 466 U.S. 668 (1984)?

Appellant's Brief, at 5-6 (reordered for ease of review).[4]

_____

[4] We initially note that Appellant's brief fails to comply with our rules of appellate procedure. Although Appellant's statement of the questions presented raises the aforementioned seven issues, the argument section of his appellate brief contains a mixed discussion of numerous arguments Appellant wishes to raise. Pa.R.A.P. 2119 ("[t]he argument shall be divided into as many parts as there are questions to be argued"). Although we acknowledge the challenges *pro se* litigants face in representing themselves on appeal, this Court has long recognized that we "must demand that pro se
*(Footnote Continued Next Page)*

We address the propriety of the PCRA court's denial order as follows:

[O]ur standard of review from the denial of a PCRA petition is limited to examining whether the PCRA court's determination is supported by the evidence of record and whether it is free of legal error. The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions.

***Commonwealth v. Miranda***, 317 A.3d 1070, 1075 (Pa.Super. 2024)

(*quoting* ***Commonwealth v. Sandusky***, 203 A.3d 1033, 1043 (Pa.Super.

2019)).

Appellant has raised multiple ineffectiveness of counsel claims. In

reviewing these arguments, we are guided by the following principles:

It is well-established that counsel is presumed to have provided effective representation unless the PCRA petitioner pleads and proves all of the following: (1) the underlying legal claim is of arguable merit; (2) counsel's action or inaction lacked any objectively reasonable basis designed to effectuate his client's interest; and (3) prejudice, to the effect that there was a reasonable probability of a different outcome if not for counsel's error. ***See Commonwealth v. Pierce***, 515 Pa. 153, 527 A.2d 973, 975–76 (1987); ***Strickland v. Washington***, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The PCRA court may deny an ineffectiveness claim if "the petitioner's evidence fails to meet a single one of these prongs." ***Commonwealth v. Basemore***, 560 Pa. 258, 744 A.2d 717, 738 n.23 (2000).... Because courts must presume that counsel was effective, it is the petitioner's burden to prove otherwise. ***See Pierce***, ***supra***;

litigants comply substantially with our rules of procedure." ***Commonwealth v. Spuck***, 86 A.3d 870, 874 (Pa.Super. 2014).

Nevertheless, as we can discern Appellant's claims for relief, we will not quash the appeal and will limit our discussion to the claims set forth in Appellant's statement of questions involved. ***See*** Pa.R.A.P. 2116(a) ("[n]o question will be considered unless it is stated in the statement of questions involved or fairly suggested thereby").

> ***Commonwealth v. Holloway***, 559 Pa. 258, 739 A.2d 1039, 1044 (1999).

***Commonwealth v. Johnson***, 179 A.3d 1105, 1114 (Pa.Super. 2018) (*quoting* ***Commonwealth v. Natividad***, 595 Pa. 188, 207-208, 938 A.2d 310, 321 (2007)).

We begin with Appellant's allegation that trial counsel was ineffective in failing to present multiple pieces of physical evidence to show he was not the perpetrator of the robbery. Appellant first argues that trial counsel should have presented photographs of Appellant at the time of the robbery to show his physical appearance did not match the robbery suspect. Appellant points out that eyewitnesses had described the robber as a slender African-American male, whereas Appellant described himself as an overweight Caucasian man that weighed approximately 220 pounds at the time of the robbery. Appellant contends that "[h]ad jurors seen images of Appellant's build, they would have doubted the eyewitness identifications." Appellant's Brief, at 10.

We note that trial counsel did highlight this discrepancy by eliciting testimony from Trooper Gross on cross-examination that three eyewitnesses at the bank had identified the robber as a 5'9" African-American male with a slender build. Notes of Testimony (N.T.), Trial, 4/5/17 - 4/7/17, at 185-86. In closing arguments, trial counsel used this point to Appellant's advantage by emphasizing to the jury that the Commonwealth declined to present the testimony of any of the eyewitnesses that reported that the robber had a "slender build." ***Id.*** at 221.

We also note that the jury was able to make their own comparison of Appellant's and the suspect's physical characteristics as the Commonwealth presented video footage and still images from bank surveillance cameras which showed the perpetrator of the robbery. *Id.* at 68-76. The video footage corroborated Crusan's testimony regarding the robbery itself and the robber's escape from the scene. Trial counsel was also able to have Crusan confirm on cross-examination that Appellant was approximately 5'8" and had the same build at trial that he did at the time of the robbery. *Id.* at 166. Alicia Aiello, the bank teller who had the opportunity to observe the robber closely, testified that she believed that the robber's skin color was unusual such that she believed his African-American skin tone was "painted on."

Trial counsel testified at the PCRA hearing that Appellant could have testified on his own behalf and introduced evidence of his specific height, weight, and other physical characteristics, but ultimately advised Appellant not to testify as the Commonwealth could have introduced Appellant's prior armed robbery conviction in response. Trial counsel believed that the jury was presented with sufficient evidence of Appellant's physical characteristics at the time of the robbery without having Appellant testify. As such, Appellant has not shown that trial counsel lacked a reasonable basis in failing to present photographs of Appellant's appearance at the time of the robbery.

Similarly, Appellant argues that trial counsel should have presented photographs of his arms to show that he had no tattoos on his hands at the time of the robbery. As noted above, the bank teller that was held up at

gunpoint reported that the robber had "the beginning markings" of a tattoo on his left hand exposed from underneath his sleeve.

The PCRA court dismissed this claim finding that Appellant had not presented photographic evidence of the lack of tattoos on his hands with corresponding proof of when such photos were taken. The PCRA court also found that Appellant had not shown he had provided trial counsel with any such photographs prior to trial. Moreover, we again note that trial counsel was reluctant to have Appellant testify to introduce such evidence as it would open the door to allow the Commonwealth to impeach Appellant with his prior armed robbery conviction. As such, such ineffectiveness claim fails.

Appellant also argues that trial counsel was ineffective in failing to present evidence of the specifications of the trunk of Crusan's rental car to disprove Crusan's allegation that Appellant had jumped in the trunk after the robbery and rode in this confined space while shaving his head and face and removing makeup. However, we agree with the trial court's finding that Appellant did not develop this claim by presenting the PCRA court with such specifications to assess Appellant's claim that Crusan's trunk narrative was implausible. As such, Appellant has not shown that this claim has arguable merit. We decline to review it further.

In addition, Appellant contends that trial counsel was ineffective in failing to present evidence that at the time of the robbery, he was gainfully employed and that he had passed multiple drug tests during parole supervision. Appellant asserts this evidence was relevant to impeach Crusan's

testimony that Appellant committed the robbery because he was addicted to heroin and struggling financially, supplying his motive for the robbery. Appellant claims trial counsel could have admitted this information through his parole officer.

We first note that Appellant did not present the PCRA court with any evidence showing clean drug screenings at the time of the robbery. Further, the PCRA court also highlighted that trial counsel was reluctant in attempting to delve into certain aspects of his parole supervision as it could have "opened the door" to the admission of more inculpatory evidence. Trial counsel wanted to avoid allowing the prosecution to inform the jury of the negative aspects of Appellant's parole supervision, including the fact that he had a prior armed robbery conviction as well as pending criminal charges related to the June 19, 2014 traffic stop that occurred two days after the robbery in which Appellant and Crusan were found to be in possession of a significant amount of heroin. *See* N.T., PCRA hrg., 8/11/22, at 11-14. We cannot find that Appellant is entitled to relief on this claim given that he has failed to show that trial counsel lacked a reasonable basis for failing to present this evidence.

Appellant also claims that trial counsel was ineffective in failing to present an alibi defense as his mother, Terri Ogrosky, could have testified that he was at her home at the time of the robbery. In reviewing similar claims, our courts have recognized that:

> [w]hen raising a claim of ineffectiveness for the failure to call a potential witness, a petitioner satisfies the performance and prejudice requirements of the ***Strickland*** test by establishing

- 15 -

that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial. ***Commonwealth v. Johnson***, 600 Pa. 329, 966 A.2d 523, 536 (2009); ***Commonwealth v. Clark***, 599 Pa. 204, 961 A.2d 80, 90 (2008). To demonstrate ***Strickland*** prejudice, a petitioner "must show how the uncalled witnesses' testimony would have been beneficial under the circumstances of the case." ***Commonwealth v. Gibson***, 597 Pa. 402, 951 A.2d 1110, 1134 (2008). Thus, counsel will not be found ineffective for failing to call a witness unless the petitioner can show that the witness's testimony would have been helpful to the defense. ***Commonwealth v. Auker***, 545 Pa. 521, 681 A.2d 1305, 1319 (1996).

***Commonwealth v. Sneed***, 616 Pa. 1, 22–23, 45 A.3d 1096, 1108–1109 (2012).

Appellant claims that he informed trial counsel that his mother could provide alibi testimony as Appellant was at his mother's residence before he went to his meeting with Alesha McGough at the drug treatment center on the day the robbery occurred. At one of his PCRA evidentiary hearings, Appellant attempted to admit a video recorded statement from his mother confirming this alibi testimony since his mother had passed away several months earlier.

Nevertheless, the trial court found trial counsel testified credibly that Appellant had not informed him that Terri Ogrosky could offer alibi testimony based on Appellant's presence at her house at the time the robbery occurred. While trial counsel recalled speaking to Terri, trial counsel testified that he was not aware that Appellant had an alibi defense. Trial counsel averred that he would have filed an alibi notice had Appellant informed him that his mother

- 16 -

was a potential alibi witness. Trial counsel also recalled that Terri Ogrosky did not attend Appellant's trial. We note that Crusan testified at trial that she and Appellant went to Terri Ogrosky's house *after* the robbery to pay a drug dealer with the proceeds of the robbery.

We defer to the PCRA court's finding that trial counsel credibly testified that neither Appellant nor Terri Ogrosky had informed him that Terri could offer alibi testimony to show Appellant was at her residence at the time of the robbery. As such, this ineffectiveness claim fails.

Appellant asserts that trial counsel should have presented other evidence to corroborate his alibi defense claiming that Appellant was at his mother's home at the time of the robbery. Appellant argues that trial counsel could have shown that Crusan's claim that she drove Appellant from the bank to the Mon-Yough counseling center after the robbery was implausible based on her timeline of the events in question. Appellant asserts that trial counsel should have admitted the logbook from Mon-Yough to corroborate the time that he signed in for his appointment as well as maps showing the distance and projected travel time from the bank to Mon-Yough.

We agree with the PCRA court's finding that Appellant has not shown he was prejudiced by trial counsel's failure to admit the logbook and maps showing the projected travel time to the counseling center. Trial counsel cross-examined the Commonwealth's witnesses as to the timeline between the departure of the getaway vehicle from the bank and Appellant's arrival at the Mon-Yough counseling center. Video surveillance captured Crusan's

vehicle picking up an individual that left the bank after the robbery. Appellant's counselor, McGough, confirmed that Appellant arrived at the center and informed her immediately in the lobby that he could not stay for his appointment, because his girlfriend was waiting outside. McGough observed that Appellant left the center in a vehicle that appeared to be the same one captured in the bank surveillance video. N.T., Trial, at 106-108. As such, Appellant has not shown prejudice from trial counsel's failure to present the logbook or maps, such that there was a reasonable probability of a different outcome in the trial.

Appellant next claims that trial counsel was ineffective in failing to file a suppression motion based on inaccuracies in the affidavit of probable cause that accompanied his arrest warrant. Specifically, Appellant argues that the affidavit misstated the timeline of when Appellant was identified as a suspect, claimed eyewitnesses descriptions matched Appellant despite stark differences in appearance, and failed to disclose exculpatory contradictions.

However, the issue of whether there was probable cause to arrest Appellant became moot after a preliminary hearing was held in which the trial court found there was probable cause to believe that Appellant committed the charged offenses. "[A]ny issue concerning a defect in the affidavit of probable cause becomes moot upon the district justice's finding at the preliminary hearing that a *prima facie* case has been established." ***Commonwealth v. Chamberlain***, 612 Pa. 107, 177, 30 A.3d 381, 423 (2011) (*citing*

*Commonwealth v. Abdul–Salaam,* 544 Pa. 514, 678 A.2d 342 (1996)). As such, Appellant is not entitled to relief.

Appellant also argues that trial counsel should have filed a suppression motion arguing that the Commonwealth conducted a warrantless search of the residence he shared with Crusan on June 21, 2014. Appellant contends that the record shows that officers did not obtain a warrant to search the shared residence. We disagree.

At trial, Trooper Gross testified that the officers obtained a warrant to search Appellant and Crusan's home on June 21, 2014. N.T., Trial at 178-80. Thereafter, at one of Appellant's PCRA hearings, trial counsel testified that he had reviewed the affidavit of probable cause associated with the relevant search warrant and concluded that there were no grounds to file a suppression motion regarding the validity of the search. Although trial counsel agreed that Appellant was not a suspect at the time that troopers searched the home, he recalled that the search warrant was targeted at Crusan in connection with her suspected involvement in the bank robbery. N.T., PCRA hearing, 8/11/22, at 36-37.

We note that Appellant limits this argument to assert that trial counsel should have claimed that the officers searched his home without a warrant. The PCRA court disagreed with Appellant's assertion that the search warrant did not exist. Appellant did not make any attempt to argue that he was still entitled to relief even if the warrant did exist; Appellant's failure to develop an alternative argument with additional analysis or citation to relevant

authority precludes our review. Our courts "will not develop an argument on an appellant's behalf." *Commonwealth v. Thomas*, 323 A.3d 611, 640–41 (Pa. 2024) (*citing* *Commonwealth v. Armolt*, 294 A.3d 364, 377 (Pa. 2023)).

Appellant next claims trial counsel was ineffective in failing to protect Appellant's right to testify and abruptly resting the defense's case without presenting any evidence. Appellant claims that trial counsel did not advise him of his absolute right to take the stand or secure a waiver of Appellant's right to testify on the stand. Appellant claims that his own testimony was necessary to impeach Crusan's credibility and allow him to present his own defense evidence.

This claim is clearly belied by Appellant's own statements at trial in which he participated in an oral colloquy confirming that he understood he had the right to testify but declined to do so to avoid the Commonwealth admitting evidence of Appellant's prior armed robbery conviction. *See* N.T., Trial, at 206-209. Appellant also agreed that he was waiving his right to present character testimony for the same reason. *See id.* at 209-211. At the conclusion of these colloquies, the trial court found that Appellant had made knowing and voluntary waivers of his rights to testify and present character evidence. Appellant cannot make arguments on appeal that contradict his own statements at trial. As such, this ineffectiveness claim fails.

Lastly, Appellant argues that the cumulative effect of trial counsel's alleged errors rendered the verdict unreliable. While no number of failed

ineffectiveness claims may collectively warrant relief if they fail to do so individually, when the failure of individual claims is grounded in lack of prejudice, the cumulative prejudice from those individual claims may properly be assessed. ***Commonwealth v. Koehler***, 614 Pa. 159, 225-26, 36 A.3d 121, 161 (2012). In assessing all of Appellant's claims on appeal in which we have found did not individually prejudice Appellant, we cannot conclude that they prejudice him when considered in the aggregate.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 03/10/2026